UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

        Plaintiffs,                   Case No. 23-CR-48-WMC

-vs-

CALVIN M. HENDERSON,            Madison, Wisconsin
                               July 12th, 2023
        Defendant.           9:07 a.m. - 10:38 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE MAGISTRATE JUDGE STEPHEN L. CROCKER

APPEARANCES:

For the Plaintiffs:
        United States Attorney's Office
        BY:  COREY STEPHAN
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin 53703

For the Defendant:
        Federal Defender Servies of Wisconsin, Inc.
        BY:  ELIZABETH BLAIR
           ALEX VLISIDES
        22 East Mifflin Street, Suite 1000
        Madison, Wisconson 53703

Also Present: CONNOR SHEEHAN, Intern.

PHILIP C. HARRELSON, RMR, CRR
United States District Court Reporter
120 North Henry Street
Madison, Wisconsin 53703
1-608-261-5708
***

1                        **W I T N E S S   I N D E X**

2     <u>PLAINTIFF'S WITNESSES</u>          <u>EXAMINATION</u>              <u>PAGES</u>

3     JORDAN TRUNDLE           Direct by Mr. Stephan          17-30
                               Cross by Ms. Blair             30-34
4                              Redirect by Mr. Stephan        35-36

5     GEORGE MAYERHOFER        Direct by Mr. Stephan          37-46
                               Cross by Mr. Vlisides          46-51
6                              Redirect by Mr. Stephan        51-51
                               Recross by Mr. Vlisides        52-52
7
      JONATHAN MATZ            Direct by Mr. Stephan          53-61
8                              Cross by Ms. Blair             61-66
                               Redirect by Mr. Stephan        66-67
9

10    <u>DEFENDANT'S WITNESSES</u>          <u>EXAMINATION</u>              <u>PAGES</u>

11    JONATHAN PARKER          Direct by Ms. Blair             6-12
                               Cross by Mr. Stephan           12-15
12                             Recross by Ms. Blair           16-16

13                               ***

14                       **E X H I B I T   I N D E X**

15    <u>PLAINTIFF'S EXHIBITS</u>                        <u>IDENTIFIED</u> <u>RECEIVED</u>

16    1  Overview map                               24        5

17                               ***

18            (Proceedings called to order at 9:07 AM.)

19         THE CLERK:  All rise.  The United States District Court for

20    the Western District of Wisconsin is now in session.  Magistrate

21    Judge Stephen L. Crocker presiding.  Please be seated and come to

22    order.

23         Case No. 23-CR-48, *United States of America versus Calvin M.*

24    *Henderson*, called for evidentiary hearing.  May we have the

25    appearances, please.

1        MR. STEPHEN:  Good morning, Your Honor.  The government
2   appears by Corey Stephan.
3        THE COURT:  Thank you.  Good morning.
4        MS. BLAIR:  Good morning.  Elizabeth Blair and Alexander
5   Vlisides on behalf of Mr. Henderson, who is present in court.
6   Also at counsel table is Connor Sheehan, who is an intern with
7   our office, who will be helping with the AV.
8        THE COURT:  Understood.  Everybody please be seated.
9        Mr. Henderson, good morning to you.
10       Counsel, good morning.
11       All right.  Our main goal today is to take evidence on the
12   suppression motion.  We also have to set the schedule.  I'd like
13   to do that after we take the evidence so we can send our
14   witnesses about their business, but don't let me forget to do
15   that.
16       I don't have any other preliminary matters, but let's tee
17   this up.
18       Mr. Stephan, I presume that you're going to be presenting at
19   least one witness in opposition today?
20       MR. STEPHAN:  Three, Your Honor.
21       THE COURT:  Okay.  Fair enough.  I've got all morning, but
22   can you give me an estimate as to about how long the
23   presentations will take.
24       MR. STEPHAN:  My presentations would probably be inside of
25   45 minutes.

1      THE COURT:  Okay.  And then, of course, there will be cross.

2      And then, Ms. Blaire, were you planning on putting on

3 witnesses this morning, or is that yet to be determined?

4      MS. BLAIR:  Your Honor, we have one witness, who is Officer

5 Parker.  He has another obligation today.  And so AUSA Stephan

6 and I agreed to call him first, if that's okay with the Court.

7      THE COURT:  Of course it is.  Yes.

8      All right.  Any other preliminary matters before we begin?

9      MS. BLAIR:  Your Honor, there's some issue with the

10 body-worn camera that perhaps the government can explain better

11 than me, but we are going to admit the exhibits *en masse* and deal

12 with them that way if that's okay with the Court.

13      THE COURT:  It is.  That's what we usually do, but let's get

14 a little bit more detail.

15      Mr. Stephan, would you like to jump in?

16      MR. STEPHAN:  Yes.  I've been consulting with Attorney

17 Blair.  And specifically the portions that she has referenced in

18 her defense exhibit, we have converted the proprietary file

19 formats to MP4, which is acceptable to the Court, and then we've

20 limited them to the time period that she specified in her exhibit

21 list.

22      There is a thumb drive, which I think we're both operating

23 from and which we'll present to the Court, that contains

24 body-worn-camera videos of Officer Parker, Officer Hinojos, and

25 Officer Sean Coffey as well as one overview photograph of the

1     area of concern.  So -- and I -- I would agree that those are

2     relevant, there's foundation, and they should be admitted into

3     evidence in this case.

4          THE COURT:  Okay.  Well, then, let me suggest this, which

5     I -- I think is what I'm hearing from -- from both sets of

6     attorneys -- I will accept into evidence, for the purposes of the

7     suppression motion, all of the exhibits offered by both parties,

8     and you don't have to lay a foundation.  You don't have to run it

9     past your witnesses, because I don't think there were any

10    objections.  And so let -- let's not dot the I's and cross the

11    T's.  Let's just do it practically.

12         Ms. Blair, are you okay with that?

13         MS. BLAIR:  Yes, Your Honor.  There are a couple supplements

14    for the officers that I was also planning on using as exhibits if

15    needed, and I believe that's also okay to admit them now.

16         THE COURT:  Okay.

17         MS. BLAIR:  Just to --

18         THE COURT:  Well -- and, again, I don't mean to beat a dead

19    horse.  But at a suppression hearing, there's no jury about which

20    we need to be concerned.  I would rather everybody puts

21    everything in.  We can compartmentalize, sort, and call later if

22    necessary, but I don't want either side to be concerned that they

23    haven't had the opportunity to put their evidence in today.

24         Ms. Blair, does that help?

25         MS. BLAIR:  Yes, Your Honor.  Thank you.

```
 1            THE COURT:  Mr. Stephan, are you good with that?
 2            MR. STEPHAN:  Yes.  Thank you.
 3            THE COURT:  Okay.  Anything else, then, from either side
 4       before we call our first witness?
 5            MS. BLAIR:  We would just invoke the rule, Your Honor.
 6            THE COURT:  Okay.  Let's do it.
 7            MR. STEPHAN:  Should I go get Officer Parker?
 8            MS. BLAIR:  That would be great.  Thanks.
 9                (Witness Parker enters courtroom at 9:12 AM.)
10              DEFENSE WITNESS, JONATHAN PARKER, SWORN
11            THE COURT:  Officer, there's water to your left if you need
12       it.
13            THE WITNESS:  Oh.  Thank you, Your Honor.
14            THE COURT:  I assume, Ms. Blair, that you're going to start
15       with direct?
16            MS. BLAIR:  Yes, Your Honor.
17            THE COURT:  All right.  Please do so.
18                    D I R E C T   E X A M I N A T I O N
19  BY MS. BLAIR:
20       Q    Good morning, Officer.
21       A    Good morning.
22       Q    Can you please introduce yourself to the Court and spell
23       your last name.
24       A    Sure.  My name is Officer Jonathan Parker, and my last name
25       is spelled P-A-R-K-E-R.
```

1    Q    And who do you work for?

2    A    I work for the City of Fitchburg Police Department.

3    Q    And what do you do as an officer?

4    A    I'm a K9 handler for the -- for the City of Fitchburg Police

5    Department.

6    Q    And do you always work with the same K9?

7    A    I do.

8    Q    And who is that?

9    A    K9 Drago.

10   Q    Is he trained in narcotics?  Apprehension?  What is he

11   trained in?

12   A    He's a dual-purpose narcotics and apprehension K9.

13   Q    Okay.  And do you remember on January 26th of 2023 being

14   involved in an operation on Post Street?

15   A    Post Road, yes.

16   Q    Post Road, yes.  I apologize.

17        I just want to ask a couple of questions about your

18   involvement on that day, okay?

19   A    Okay.

20   Q    Do you remember being in the hallway initially before you're

21   going up to Apartment 207?

22   A    In --?

23   Q    The apartment building --

24   A    Yes, I was in the apartment building.

25   Q    Yes.

1     A     Yes.

2     Q     Exactly.  Okay.  And my understanding is before the search

3     warrant was received, the occupants are taken out of the

4     apartment; is that right?  Apartment 207?

5     A     Correct.

6     Q     Okay.  Now, initially, there's a knock, and no one answers?

7     A     Yes.

8     Q     Okay.  And you ask if they would like to do a bark-out?

9     A     Yeah, that was, I think, part of the contingency for that

10    operation was to use the K9 in assistance with TRT.

11    Q     What do you mean a "contingency for that operation"?

12    A     It was just like, you know, if we don't have an answer,

13    we -- you know, and no one comes to the door, that we would have

14    a K9 do a -- what -- yeah, you could say a "bark-out," if you

15    want to call it.

16    Q     I believe "bark-out" was -- was your words; is that right?

17    A     Yeah, but that might be an informal term that I'm using

18    with, you know, the TRT members at that moment, because we're

19    just, you know, plain talk at that moment.

20    Q     It seemed like the TRT members knew what you were talking

21    about, nodded, and said "Yes."

22    A     Correct.

23    Q     That seems like a term you've used before.

24    A     Yes.

25    Q     And what exactly is a bark-out?

1    A    Well, in this term, we're doing is we're going up to the

2    apartment, notifying the people inside of the apartment that

3    there is a K9 on scene, and then, obviously, giving a warning,

4    saying that there's a K9 here and that it gives a consequence to

5    the warning, and then it gives them an opportunity to peacefully

6    comply after the K9 is, you know, notified to them on scene.

7    Q    Now, is bark-out something that's used in your standard

8    operating procedures, or SOPs?

9    A    It is.

10    Q    Is it named in the SOP as a bark-out?

11    A    There's no SO- -- well, there's not an SOP for it.  It's

12    just not -- not a procedure that we do, and it's more or less a

13    deescalation technique.

14    Q    A deescalation technique?

15    A    Yes.

16    Q    It's something you employ often?

17    A    Yes, multiple times.

18    Q    In what types of circumstances would you use a bark-out?

19    A    In search warrants like these because tactics have changed,

20    and we try to get people to come out of the apartment.  So we're

21    trying to get -- more or less, try to clear the apartment before

22    we actually physically go in there with officers.

23        And so if people aren't complying inside the apartment,

24    we provide a K9 warning, saying that if they don't comply, that

25    there's a potential consequence to that, which would be my K9

1    being utilized.  And then it gives them an opportunity to

2    peacefully comply, and usually that -- that works as a -- as a

3    technique because people don't want to, you know, have to, you

4    know -- our K9 being diploid on them.

5    Q    And the warning you gave here is "Either come out, or my dog

6    will go in, and you will be bit"; right?

7    A    Correct.

8    Q    You also said that it occurs in situations where a search

9    warrant like this.  You're aware that there was no search warrant

10   at the time that you knocked and the K9 warning was given?

11   A    I mean, correct.  It was a search warrant operation.  So we

12   were applying for a search warrant, yes.

13   Q    And there was no search warrant at that moment?

14   A    No, we were applying for it.

15   Q    When you say "We were applying for it"?

16   A    Well, the Fitchburg Police Department.  I should clarify.

17   Q    Okay.  You weren't involved in writing it?

18   A    I was not.  I was assisting in the operation.

19   Q    Have you ever used the bark-out in other situations where

20   there isn't a search warrant?

21   A    Yes, I've used this -- the presence of my K9 on scene in

22   multiple instances where we're dealing with people that are

23   potentially armed and dangerous, yes.

24   Q    When you say "the presence of your K9," I suppose what I'm

25   talking about is a threat of the K9; right?  That "either come

1    out, or you will be bit"; right?

2    A    I wouldn't call it a threat.  It's just merely me notifying

3    them or providing them notice that I have a K9 and there's a

4    consequence if they don't comply with our requests for them to do

5    whatever action it is at that moment.

6    Q    Right.  And if they don't come out, they will be bit?

7    A    Yes.

8    Q    Okay.

9    A    That's a consequence, yes.

10   Q    Yes.  Okay.  And so the question was when there hasn't been

11   a search warrant, right, you've used this technique of a bark-out

12   before?

13   A    I've used it on the street with high-risk, you know,

14   contacts with people.  I've used it in the context of, like, if

15   we're at an apartment complex and maybe we're dealing with a

16   violent offender that might be still inside the apartment, but we

17   don't want to make contact with officers.  I've used it in that

18   context.  I've used it in search warrants.  I've used it in

19   similar circumstances like this where even -- while we're

20   applying for a search warrant, due to whatever circumstance, and

21   they ask me to do -- to come up with my K9 and to give K9

22   warnings.  I've done it multiple times, yes.

23   Q    Okay.  And you've worked with the TRT team before, it seems

24   like?

25   A    Correct.

1      Q      Okay.

2             MS. BLAIR:  I have no further questions.  Thank you very

3      much, Officer.

4             THE COURT:  Any cross?

5             MR. STEPHAN:  Yes.  Briefly.

6                       C R O S S - E X A M I N A T I O N

7      BY MR. STEPHAN:

8      Q      Officer, you did not make the knock-and-order-out decision

9      in this case, did you?

10     A      I did not.

11     Q      Did you -- and you testified that you knew that Detective

12     Jordan Trundle would eventually be applying and presenting a

13     search warrant to a Dane County judge; correct?

14     A      Yes.

15     Q      And have you, in the past, been involved in situations where

16     law enforcement has been essentially securing the exterior of

17     a -- of a building or a residence prior to the -- the issuance of

18     a search warrant?

19     A      Yes.

20     Q      Were you aware, as you were securing -- before the

21     knock-and-order-out order happened, were you aware that there

22     were guns in that apartment?

23     A      Yes, that was -- what was suspected at the point, yes.

24     Q      And were you also aware that law enforcement was essentially

25     comp- -- compromised because there was significant law

1    enforcement presence at that apartment building?

2    A    Yes.  At that point, we had a significant law enforcement

3    presence, and, yes, I think we were -- or there was a belief that

4    we were compromised or known to the occupants that we were

5    present at the apartment complex.

6    Q    And you knew that there were people inside of Apartment 207

7    while you were standing by; is that correct?

8    A    Yes.

9    Q    And prior to going up to that hallway with TRT, had

10   Fitchburg Police Department done a consent search at Apartment

11   107 directly below it?

12   A    Correct.

13   Q    You've watched your body-worn camera of this incident; is

14   that correct?

15   A    I did.

16   Q    Once verbal contact was made -- let's -- I'm sorry.  Let me

17   back up one.  You said that someone from the TRT knocked at the

18   door; is that correct?

19   A    Yes.

20   Q    And there was no response?  The only --

21   A    I don't recall if there was a response.  I was pretty far

22   back.  I don't know if they heard somebody or they didn't.

23   Q    And then did you move up when you did your bark-out?

24   A    Yes, after we communicated back and forth with the TRT

25   members, I came up to -- closer to the door.  That's where I did

1    the actual K9 warnings.

2    Q    And after you did that bark-out -- I'm just going to use

3    your colloquial term here.

4    A    Mm-hmm.

5    Q    Did that elicit a verbal response from the occupants inside

6    of 207?

7    A    It did.

8    Q    And once there was that verbal contact, what did you do with

9    your K9 Drago?

10   A    After there was verbal contact and people were starting to

11   come out to the apartment, I immediately removed him from inside

12   of the shared hallway right there, back towards the stairwell

13   where there's a door, and I kind of wedged him into a corner so

14   that we weren't, like, physically involved with the occupants

15   coming out of the apartment, and no -- so we didn't have any

16   contact with them.

17   Q    And at that point, when people were coming out, was K9 Drago

18   still barking, or had -- did you have him calmed down and quiet?

19   A    I had him calmed and quiet, kind of shoved into a corner,

20   like outside in the stairwell, out of contact.

21   Q    Was that -- was the purpose of that to kind of take him out

22   of the equation because you no longer needed his presence?

23   A    Correct.

24   Q    How is -- I think you described the bark-out as a

25   "deescalation technique."  How is it a deescalation technique?

1  A    Well, we -- just the presence of the K9, in essence, is --

2  we -- we -- our goal always is that we don't -- want to use the

3  least amount of force as possible, especially in instances where

4  we believe that there are people are armed and dangerous inside

5  of an apartment.  We want them to come into -- towards us or into

6  our space that we control.  And so the use of a K9 in this manner

7  serves as a deescalation technique because just his mere presence

8  assists in voluntary compliance of people inside, and then they

9  usually come out with his presence, and then we can be a lot

10 safer with our operation past that point.

11 Q    What kind of dog is Drago?

12 A    He's a Belgian Malwa.

13 Q    And is he a certified police dog?

14 A    He is a certified police K9.

15 Q    And how long has he been a K9 with you?

16 A    Now we're looking at, I think, about six years now.

17 Q    And do you go through constant recertification and

18 continuing training?

19 A    We do an annual certification, and we train him a minimum of

20 16 hours formally a month.

21      MR. STEPHAN:  Thank you.  I don't have any further

22 questions.

23      THE COURT:  Did you wish to redirect?

24      MS. BLAIR:  Briefly, Your Honor.

25           R E D I R E C T   E X A M I N A T I O N

```
 1   BY MS. BLAIR:
 2   Q    On cross, you stated that law enforcement was compromised.
 3   By "compromised," did you just mean that there was a large law
 4   enforcement presence at the apartment complex?
 5   A    By "compromise," I mean that we had a -- we could reasonably
 6   believe that the people inside of Apartment 207 knew that law
 7   enforcement were on scene and outside of the apartment.
 8   Q    Why?
 9   A    Because we -- at that point, we already made contact with
10   Apartment 107.  We had a large -- large law enforcement
11   contingent there.  We had Dane County TRT on scene.  We had
12   multiple Madison officers on scene.  We had Fitchburg officers on
13   scene.  So I think it would be reasonable to believe that, you
14   know, the people inside of 207 potentially knew that we were at
15   the apartment complex.
16        MS. BLAIR:  I have no further questions.  Thank you,
17   Officer.
18        THE COURT:  All right.  Thank you, Officer.  You're done.
19   You're free to go about your business.
20        MR. STEPHAN:  Attorney Blair, could he be released from your
21   subpoena?
22        MS. BLAIR:  Yes.
23        MR. STEPHAN:  Thank you, sir.  You're free to go.
24              (Witness excused at 9:25 AM.)
25        THE COURT:  All right.  So now we're switching to government
```

1    witnesses.

2              MR. STEPHAN:  Yes, Your Honor.

3              THE COURT:  All right.  Please call your first witness.

4                   (Witness enters courtroom at 9:25 AM.)

5               PLAINTIFF WITNESS, JORDAN TRUNDLE, SWORN

6              THE COURT:  There's water to your left if you need it.

7              THE WITNESS:  Thank you.

8                   D I R E C T   E X A M I N A T I O N

9    BY MR. STEPHAN:

10   Q    Sir, could you please, for the record, state your full name,

11   spelling your last.

12   A    Jordan -- J-O-R-D-A-N -- Trundle -- T-R-U-N-D-L-E.

13   Q    And what is your profession, sir?

14   A    I'm a detective with the Fitchburg Police Department.

15   Q    How long have you been a law enforcement officer?

16   A    Since June of 2007.

17   Q    Has that all been with the City of Fitchburg Police

18   Department?

19   A    It has.

20   Q    What is your current assignment?

21   A    I'm a detective.

22   Q    How long have you been a detective?

23   A    Since June of 2019.

24   Q    And what type of cases do you investigate as a detective?

25   A    It's really a wide range of cases.  Anything that involves

```
1    additional work or investigative means.
2    Q    And does it also involve applying for search warrants?
3    A    Yes, it does.
4    Q    And have you received training in writing search warrants?
5    A    Yes, I have.
6    Q    If I could direct your attention to January 26th of 2023.
7    Were you involved in an investigation on that date?
8    A    Yes, I was.
9    Q    And did that culminate in the search warrant that you wrote
10   and received for 2401 Post Road, Apartment 207, in the City of
11   Fitchburg?
12   A    That's correct.
13   Q    And what was the -- I suppose the genesis of that
14   investigation that led you to that apartment on that date?
15        THE COURT:  Wait.  Just a second.  I don't mind if you
16   explore this with Detective Trundle; but if you're just going to
17   walk him through his warrant application, that's not necessary.
18        MR. STEPHAN:  I will be mindful of that.  And I --
19        THE COURT:  Please proceed.
20        MR. STEPHAN:  Could I be a little bit directive to --
21        THE COURT:  Any problem with -- with him leading him in?
22        MS. BLAIR:  That's fine.
23        THE COURT:  Okay.  Let's make it clean.
24        MR. STEPHAN:  Thank you.
25   BY MR. STEPHAN:
```

1    Q    Detective, the -- the -- essentially, the beginning of this

2    investigation was -- it all stemmed from a December 4, 2022,

3    shooting in Fitchburg; correct?

4    A    Correct.

5    Q    And had you been investigating that shooting up to

6    January 26th of 2023?

7    A    Correct.

8    Q    And the information contained in your search warrant -- that

9    contains a lot of the background information that led you to that

10   date in January 26th; correct?

11   A    That is correct.

12   Q    Was the arrest of the person by the name of "Oscar" a -- on

13   that morning an important event that kind of forwarded the

14   investigation?

15   A    Yes, it was.

16   Q    And was it because he gave the information contained in the

17   search warrant?

18   A    That's correct.

19   Q    And when you were investigating information that you got

20   from Oscar, did you go to 2401 Post Road?

21   A    Later in the afternoon, yes.

22   Q    And did you have consensual contact with the occupants in

23   Apartment 107?

24   A    I did not.

25   Q    Other Fitchburg police officers did?

1    A    Correct.

2    Q    And did they perform a consent search at Apartment 107?

3    A    Yes, they did.

4    Q    And is 107 directly under 207, which is the subject of the

5    investigation here?

6    A    Yes, it is.

7    Q    And were you aware of any connection between the occupants

8    of 107 and 207?

9    A    Yes, I was made aware of that.

10   Q    And what was that connection?

11   A    There was a sexual relationship between one of the females

12   in 107 and one of the males in 207.

13   Q    Was that Sam Crump?

14   A    Yes, it was.

15   Q    And did you have reason to believe that -- was the female

16   present in 107 that morning -- or that day?

17   A    There was one female present there, and then I was made

18   aware that another female had arrived later.

19   Q    And were you concerned that the people in 107 may have

20   tipped off the people in 207?

21   A    Yes, I was.

22   Q    Was it your intention to write a search warrant to search

23   Apartment 207, based upon your -- your investigation?

24   A    Yes.

25   Q    And did you, in fact, start writing a search warrant?

1    A    Yes, I did.

2    Q    About what time did you start writing the search warrant?

3    A    I would say approximately 1:20 or 1:30 p.m.

4    Q    And how long did it take you to write that warrant

5    approximately?

6    A    So I had not previously started writing this warrant at all.

7    So it took me longer.  So I would say two hours initially.

8    Q    And did that -- did that involve consulting with me about

9    the contents of that search warrant?

10   A    Yes, it did.

11   Q    Did that consultation with me happen at about what time?

12   A    Approximately 3:30.

13   Q    So after the knock-and-order-out?

14   A    Correct.

15   Q    So between the consent search of 107 and the

16   knock-and-order-out at about 2:57 p.m., did you have any concerns

17   about that apartment and your operation?

18   A    Apartment 207?

19   Q    Yes.

20   A    Yes.

21   Q    And what were those concerns?

22   A    So as I was writing the warrant, there's a lot of different

23   people involved in different roles.  So specifically, I had a

24   supervisor contact me that there was concern about the residents

25   within the apartment complex, and there was concerns about an

1    elementary school that is probably within a hundred yards of this

2    specific apartment, and that school was going to be letting out

3    soon.  So they were curious as to how long it would take me to

4    write the warrant and what steps I needed to take to make the

5    area safe.

6    Q    And as you had these concerns, were you aware that there --

7    or did you have information that there was firearms in Apartment

8    207?

9    A    Yes, I was made aware of that.

10   Q    And was that the information that is contained in the

11   warrant?

12   A    Yes, it is.

13        THE COURT:  Let me interrupt.  You used the word "concerns."

14   Are we talking about safety concerns?

15        MR. STEPHAN:  I'll be more specific.

16   BY MR. STEPHAN:

17   Q    Yeah, safety concerns?

18   A    Yes, there were safety concerns.

19   Q    And was it in reference to the firearms you just told us

20   about?

21   A    Yes, it was.

22   Q    And did you also have information that there was potentially

23   controlled substances in that apartment?

24   A    Yes, I was made aware of that.

25        MR. STEPHAN:  May I approach the witness, Your Honor?

```
1              THE COURT:  You may.  And both sides have continuing
2       permission to approach all witnesses.
3              MR. STEPHAN:  Thank you.
4              Can I have this -- do you mind stuff old-school?  Paper
5       copy?
6              THE COURT:  That still works.
7              MR. STEPHAN:  Can I have that marked as Exhibit 1.
8              MS. BLAIR:  Your Honor, I apologize.  Could we take a brief
9       break.  Mr. Henderson takes medication that requires a couple
10      breaks.
11             THE COURT:  Absolutely.  Let's break for five minutes.
12             MS. BLAIR:  Thank you.
13             THE COURT:  Counsel, while we're on break, if nobody else
14      needs a break, are you comfortable going off the record, letting
15      our court reporter rest and we set the schedule?
16             MS. BLAIR:  Yes.
17             (A break in proceedings from 9:33 AM to 9:35 AM.)
18             THE COURT:  Okay.  So let's go back on the record and
19      continue with the questioning.
20             MR. STEPHEN:  All right.
21      BY MR. STEPHEN:
22      Q     Sir, I'm going to show you what's been marked as Exhibit
23      No. 1.  Have you ever seen that before?
24      A     Yes, I have.
25      Q     What is that?
```

1   A    That's an overview map of the area.

2   Q    And is 2401 Post Road visible on that?

3   A    Yes, it is.

4   Q    Could you -- I'm going to give you a blue marker.  If you

5   can, just circle the building that's 2401 Post Road.  And you

6   circled something in the lower right-hand corner of that; is that

7   correct?

8   A    That is correct.

9   Q    And could you put an "X" that designates where the windows

10  are at Apartment 207.  And directly out from the windows of

11  Apartment 207, does that overlook a large complex?

12  A    Yes, it does.

13  Q    Is that visible in Exhibit 1 as well?

14  A    Yes, it is.

15  Q    What is that large complex?

16  A    That's Leopold Elementary School.

17  Q    And as this operation was taking place and law enforcement

18  investigation, did you have any time concerns in terms of what

19  may have been happening at the elementary school?

20  A    I was made aware by my supervisor in the tactical response

21  team that they were concerned about the let-out time of the

22  elementary school, which was approaching.

23  Q    And did that add some urgency to resolving the security

24  situation in that apartment?

25  A    Yes.

1  Q So starting at about 1:30.  When you're writing a search

2  warrant, the affidavit -- where did you do that?

3  A In my office.

4  Q At Fitchburg PD?

5  A That is correct.

6  Q And who was in control at the scene of 2401 Post?

7  A The tactical response team was -- well, initially, it was

8  some patrol officers and a supervisor that was there.  Madison

9  Police Department was assisting, and then it transitioned to

10  Lieutenant Ira Simpson of the Dane County Sheriff's Office who

11  runs the tactical response team.

12  Q And would that transition to TRT have happened prior to

13  2:57?

14  A I don't know what time that transition took place.

15  Q But it was before 2:57 because TRT was there during the

16  order-out; right?

17  A Yes.  Yes.  I'm sorry.  That's correct.

18  Q Were you directly involved with the knock-and-order-out?

19  A No, I was not.

20  Q Did TRT have the discretion to make their own tactical calls

21  at the scene?

22  A Yes, they did.

23  Q And are you aware, based upon your chain of command, some of

24  the discussions that TRT was having, reference how they were

25  going to proceed?

1   A   Yes, I was.

2   Q   And did they share the same safety concerns that you had

3   testified about?

4   A   That is correct.

5   Q   And does that involve guns being at that apartment?

6   A   Yes.

7   Q   And how did you know that that apartment was occupied --

8   207?

9   A   Earlier in the morning, I was conducting surveillance and

10  observed someone that's in the search warrant who was identified

11  two days earlier leave the apartment complex.  I interviewed that

12  subject, and he told me who was in there and where certain things

13  would be located in there.

14       Eventually, another person left that same apartment.

15  That person was interviewed by another detective and confirmed

16  the same information.  And then the tactical response team also

17  relayed information that they could hear voices inside and that

18  some of the blinds were moving and opening and closing,

19  confirming that people were inside.

20  Q   And you were made aware that a -- a knock-and-order-out and

21  then a subsequent protective sweep were conducted; is that

22  correct?

23  A   That is correct.

24  Q   And were you made aware of some observations that officers

25  made during that protective sweep inside the apartment?

1    A    I was made aware of that, yes.

2    Q    And did you include that portion in a paragraph on page 9 of

3    your affidavit?

4    A    Yes, I did.

5    Q    Had you not had that information about the observations

6    during the protective sweep, would you still have persisted in

7    presenting the search warrant to a judge?

8    A    Yes.  That's what I was working on, and that was the plan.

9    Q    So the observations didn't change what you were going to do?

10   A    No, it did not.

11   Q    Are you familiar with the defendant in this case, Calvin

12   Henderson?

13   A    Yes, I am.

14   Q    And have you reviewed portions of the interviews that he

15   conducted with Detective Matt Overstreet after the arrest in this

16   case?

17   A    Yes, I did.

18   Q    And have you had personal contact with Mr. Henderson?

19   A    Yes, I have.

20   Q    And on how many occasions?

21   A    I think four total.

22   Q    And during those occasions, have you had opportunities to

23   talk with him?

24   A    Yes.

25   Q    Was one an interview, reference an arrest?

1    A    Yes.

2    Q    A separate arrest than this one; is that correct?

3    A    Correct.

4    Q    And did he actually initiate contact with you once at court?

5    A    Yes, he did.

6    Q    And was that at the preliminary hearing on the state case

7    that came out of January 26th?

8    A    Yes, it was.

9    Q    And what happened there?

10   A    The prelim did not happen.  I was sitting in court.  He

11   motioned for me to come over and sit with him, and he wanted to

12   provide more information with regards to this investigation.

13   Q    Did he have an attorney at the time?

14   A    He did not.

15   Q    And did you consult with the ADA?

16   A    Yes, I did.

17   Q    And did the ADA give you permission to have a conversation

18   with Mr. Henderson?

19   A    Yes.

20   Q    And did that happen outside of Court?

21   A    Yes, it did.

22   Q    About how long did it take?

23   A    I think we talked for maybe a half an hour, and then the

24   conversations continued throughout the day through phone calls.

25   Q    And did Mr. Henderson want to clarify aspects of the

```
 1        investigation?
 2        A    Yes, he did.
 3        Q    And did he appear, during your conversation with him, to
 4        understand your questions?
 5        A    Yes, he did.
 6        Q    Did he appear to be able to respond appropriately?
 7        A    Yes, he did.
 8        Q    Based upon your contact with him as well as a review of the
 9        interview that happened after the arrest in this case, did it
10        appear that he was responsive and able to understand questions?
11        A    Yes.
12        Q    Did it appear to you that -- as a layperson, that he had any
13        mental health issues that may have precluded his ability to
14        communicate with you?
15        A    I don't think so.
16        Q    Is he a drug user?
17        A    I think he is, yes.
18        Q    And was there -- do you have an indication whether or not on
19        January 26th, he was using drugs?
20             MS. BLAIR:  Your Honor, I would object to this for lack of
21        personal knowledge and speculation.
22             MR. STEPHAN:  I'll move on.
23             THE COURT:  Please do.
24   BY MR. STEPHAN:
25        Q    You know what date that happened in court at the prelim?
```

```
1    A     It was in February of 2023.  I would have to look at my
2    report for the exact date.
3    Q     Prior to the knock-and-order-out, did you have concerns that
4    the occupants of 207 knew about the law enforcement presence and
5    operation?
6    A     Yes.
7    Q     You did not make the decision for the knock-and-order-out,
8    did you?
9    A     No, I did not.
10   Q     Was that something that was in the discretion of the TRT at
11   the scene?
12   A     Yes.
13         MR. STEPHAN:  Thank you.  No further questions.
14         THE COURT:  Very well.  Cross-examine.
15                   C R O S S - E X A M I N A T I O N
16   BY MS. BLAIR:
17   Q     Good morning, Detective.
18   A     Good morning.
19   Q     Just to be clear, you weren't present at the apartment
20   complex when TRT went in the apartment; right?
21   A     No, I was not.
22   Q     You weren't present when they spoke with Mr. Henderson
23   immediately after he exited the apartment?
24   A     No, I was not.
25   Q     So you didn't hear anything about consent or not consent or
```

1    anything like that; right?

2    A    No, I did not.

3    Q    Okay.  So when you talk about, you know, what's going on in

4    the hallway outside 207, that's just what you heard over the

5    radio, what you heard from other people there?

6    A    What do you mean when I talk about -- can you be more

7    specific?

8    Q    So on direct, you testified about what was happening around

9    that apartment complex.  So perhaps they knew that there was law

10   enforcement there, that -- what the supervisor there was saying.

11   You all heard that from other people; right?  You had no personal

12   knowledge about what was going on in the hallway outside

13   Apartment 207?

14   A    I would say "yes" and "no" because there's radio

15   transmissions.  So observations that people are seeing are

16   transmitted over the radio.  So then you hear what their

17   observations are.  And I guess me and my coworkers -- I trust and

18   believe the observations that they're relying over those.

19   Q    Okay.  So you heard it over the radio?

20   A    Correct.

21   Q    Okay.  You also testified that you knew about a sexual

22   relationship between someone who lived in Apartment 107 and

23   Samuel Crump, who was in Apartment 207?

24   A    Correct.

25   Q    And you testified that you learned about that before the

1    search warrant was written?

2    A    If I can correct myself.  While I was writing the search

3    warrant.

4    Q    You learned about that while; not after?

5    A    While writing it, correct.

6    Q    Okay.  I want to talk about a couple of the other things

7    that you testified about on direct.  You're the lead detective in

8    this case?

9    A    Correct.

10    Q    Okay.  And as the lead detective in this case, you're

11    responsible for authoring a lot of reports; right?

12    A    Yes.

13    Q    And in those reports, you make sure that you are thorough?

14    A    Try to be, yes.

15    Q    And it seems like almost every time you did anything in this

16    case, you wrote it down?

17    A    Correct.

18    Q    Okay.  Now, I want to talk about the safety concerns that

19    you testified about on direct.  In all of your writing on this

20    case, including the warrant, and including your grand jury

21    testimony, you never mention that there is a school across the

22    street, and that is a safety concern for this operation going in

23    on that day?

24    A    Can I expand on the answer instead of just say "yes" or

25    "no," because it's kind of complicated.

1    Q    Of course.

2    A    Okay.  So this investigation involved several different

3    investigations with several different reports.  I don't know what

4    you have or what you don't have.  But involving the shooting from

5    December 4th, I do give a very detailed description of that area,

6    the park and the school.

7              As far as documenting the -- that day and the

8    concerns -- that would be more of the tactical responses team's

9    job to document that in what they're relaying to me and put in a

10   report.

11   Q    The different members of the TRT team -- you're aware that

12   they also make reports in this case and they write down what

13   happened?

14   A    Yes.

15   Q    And so if that was a concern of theirs, they would include

16   that in a report, or they should include that in a report?

17   A    I don't know what -- they're -- so they're a different

18   agency.  So I don't know what they should or should not do.

19   Q    If it was up to you and you had a concern --

20   A    I would --

21   Q    -- you --

22   A    -- personally document those things, correct.

23   Q    I think that's fair to say.

24             In your reports, though, you include things that other

25   people told you and what was going on at Apartment 107, right,

1       even though you're not there?

2       A    Correct.

3       Q    Okay.  But you don't include anything about any safety

4       concerns because of a school?

5       A    If you say I didn't include it, I probably didn't include

6       it, then, in the warrant.

7       Q    I have checked.  I promise.

8       A    Okay.

9       Q    But obviously --

10           THE COURT:  I think we've beaten this one enough.  Let's

11      move on, please.

12           MS. BLAIR:  Okay.

13  BY MS. BLAIR:

14      Q    You also spoke about the TRT heard blinds opening and

15      closing?

16      A    Correct.

17      Q    Or saw blinds opening and closing.  I'm sorry.  And that's

18      also not in your reports?

19      A    Correct.

20      Q    I just have one last area to ask you about, Detective.  Your

21      understanding of why law enforcement officers knocked on the door

22      prior to the search warrant is that that was just to do a

23      knock-and-talk and secure the residence prior to getting the

24      warrant?

25      A    My understanding was is that they were going to knock and

```
 1         make contact, yes.
 2              MS. BLAIR:  I have no further questions.  Thank you,
 3         Detective.
 4              THE WITNESS:  Thank you.
 5              THE COURT:  Very well.  Any redirect?
 6              MR. STEPHAN:  Yes.
 7                    R E D I R E C T   E X A M I N A T I O N
 8    BY MR. STEPHAN:
 9         Q    Detective, do Fitchburg police officers wear body cameras?
10         A    Yes, they do.
11         Q    Is that all officers and detectives?
12         A    All patrol officers, detectives.  There's different policies
13         on when it needs to be on and off.
14         Q    At the time you wrote the reports in this case, did you know
15         what issues would be raised in the case?
16         A    When I wrote the reports?
17         Q    Yes.
18         A    No.
19         Q    You had testified that there had been documents in the past
20         about the school in relation to this apartment building.  Is this
21         particular area an area of concern in Fitchburg?
22         A    Yes, it is.
23         Q    Are there a lot of crimes there?
24         A    Yes.  In particular, there's a lot of shootings in that
25         area.
```

1   Q    Are officers very much aware, in their daily activities,

2   that there is a school present to where these shootings take

3   place?

4   A    Yes, they are.

5        MS. BLAIR:  Your Honor, I would object to speculation.

6        THE COURT:  I think I could take judicial notice of the

7   number of federal gun cases and drug cases we've had in that

8   neighborhood of Fitchburg.  So --

9        MS. BLAIR:  Sure.

10       THE COURT:  -- let's just move on.

11       MR. STEPHAN:  Thank you.  I don't have anything further.

12       THE COURT:  Very well.

13       Thank you, Detective.  You're done.  You're free to go about

14   your business.

15       THE WITNESS:  Thank you.

16                    (Witness excused at 9:51 AM.)

17       THE COURT:  Do we need another break, or may we call another

18   witness?

19       MS. BLAIR:  We're good, Your Honor.  We can call --

20       THE COURT:  Okay.

21       MS. BLAIR:  -- another witness.

22       THE COURT:  Let's keep going.

23            (Witness enters courtroom at 9:51 AM.)

24        PLAINTIFF WITNESS, GEORGE MAYERHOFER, SWORN

25       THE COURT:  And there's water to your left if you need it.

```
 1                THE WITNESS:  Thank you.
 2                   D I R E C T   E X A M I N A T I O N
 3  BY MR. STEPHAN:
 4        Q    Sir, could you please, for the record, state your full name,
 5        spelling your last.
 6        A    George Mayerhofer.  Last name is M-A-Y-E-R-H-O-F-E-R.
 7        Q    And what is your profession, sir?
 8        A    I'm a detective with the Dane County Sheriff's Office.
 9        Q    How long have you been a law enforcement officer?
10        A    Since January of 2000.
11        Q    Has it all been with the Dane County Sheriff's Office?
12        A    Yes, sir.
13        Q    And are you also a member of the tactical response team?
14        A    I am.
15        Q    Is that Dane County's version of a SWAT team?
16        A    Yes, it is.
17        Q    How long have you been a TRT member?
18        A    Since 2006.
19        Q    What is your current assignment?
20        A    Detective, day shift out of the southeast precinct.
21        Q    How long have you been a detective?
22        A    Since December of 2011, I believe.
23        Q    Were you on duty on January 26th, of 2023?
24        A    I was.
25        Q    And did you respond to a call-out from the TRT supervisor,
```

1    Ira Simpson?

2    A    I did.

3    Q    And what was asked in that call-out?

4    A    To respond to Fitchburg to assist them with an ongoing

5    investigation they had.

6    Q    And were you made aware that there were shooting suspects

7    inside of an apartment building -- an apartment?

8    A    I was, yes.

9    Q    And did you go to the scene 2401 Post Road?

10   A    Went near the scene.  Initially to stage, but ended up, yes,

11   at that address.

12   Q    Now, let me ask you.  Does -- at the time that this activity

13   took place -- this law enforcement activity -- was TRT mandated

14   to wear body-worn cameras?

15   A    At that time, no.

16   Q    And do you know why?

17   A    I know we had a policy that was waiting for approval, and

18   this wasn't approved at that time.

19   Q    Do -- does TRT now wear body-worn cameras?

20   A    Yes, we do.

21   Q    And had you worked with Fitchburg PD in the past?

22   A    Yes.

23   Q    And on January 26th of this year, were you aware that

24   Fitchburg PD officers were mandated to wear body cameras?

25   A    Yes.

1    Q    So after staging, did you and other TRT members proceed into

2    the building at 2401 Post Road?

3    A    Yes.

4    Q    And was there a law enforcement presence inside that

5    building?

6    A    Yes, there was.

7    Q    Specifically, on the second floor outside of Apartment 207,

8    who was there?

9    A    When I got to that address and started making my way up the

10   stairs, there was Dane County tactical response team members

11   currently there as well as Fitchburg officers.

12   Q    And were you aware whether or not Fitchburg was writing a

13   warrant to search 207?

14   A    Yeah, intel relayed to me was that they were in the process

15   of writing a search warrant for that apartment.

16   Q    Was that part of a briefing given to TRT?

17   A    I received that from -- Ira Simpson told me that.

18   Q    And were you also made aware of whether or not there were

19   firearms inside of that apartment?

20   A    Yes, I was told that there were.

21   Q    And were you aware of law enforcement and community safety

22   concerns relative to that apartment and the operation?

23   A    Yes.

24   Q    And what were those concerns?

25   A    People leaving the apartment, people coming near the

1    apartment, into it, just kind of securing the area to make it

2    safe for people.

3    Q    And had you been aware that this apartment was tied to a

4    recent shooting?

5    A    Yes.

6    Q    So when you got outside Apartment 207, what was your

7    responsibility -- you and the rest of your TRT counterparts?

8    A    While we were staging, we were just holding, waiting for the

9    warrant to be signed; like I said, kind of making sure that

10   nobody was coming to or from the apartment.

11   Q    And you watched the body cams from the Fitchburg officers in

12   this case; is that correct?

13   A    That is correct.

14   Q    And do those body cams show TRT staging kind of at the end

15   of the hallway?

16   A    Yes.  We're staged kind of at the top of the stairs.

17   There's a fire door, if you will, and TRT is kind of staged at

18   that door, and then down the stairs.

19   Q    At some point, had the -- was a decision made to have TRT do

20   a knock-and-order-out of that apartment?

21   A    Yes, there was a decision made by Lieutenant Simpson who

22   relayed that information to us.

23   Q    And what did TRT do in response to that decision?  And I

24   suppose it would be an order from Lieutenant Simpson; right?

25   A    Correct.

```
1    Q    What would -- what did you do?
2    A    We moved to Apartment 207.  We set up.  We call it the
3    "final assault position."  So we're to the left of the door,
4    right of the door, and we started giving -- knocking on that --
5    on that door and giving verbal to come to the door.
6    Q    And to be clear, all of the TRT members were wearing
7    ballistic helmets, body armor, and carrying rifles; is that
8    right?
9    A    Yeah, I believe everybody was.  I know -- you know, I was.
10   Q    You said that a deputy member of the TRT knocked on the
11   apartment door of 207?
12   A    That is correct.
13   Q    Was there any response?
14   A    Initially, no.
15   Q    And after not getting a response from the knock, what
16   happened next?
17   A    I believe someone thought they heard a male voice on the
18   inside; but then shortly after that, we used a Fitchburg K9
19   officer to start giving verbal announcements with -- with him and
20   his dog.
21   Q    And did that elicit a response from the occupants of 207?
22   A    Yes, it did.
23   Q    And did they make verbal contact with you?
24   A    They said something inside.  I couldn't make out what they
25   said, but they did come to the door.
```

```
1    Q    And did -- did people exit Apartment 207?

2    A    Yes.

3    Q    Who was the first person out?

4    A    Mr. Calvin Henderson was the first person out.

5    Q    And what was he wearing?

6    A    Just underwear.

7    Q    And when he came out, what did you do?

8    A    When he came out, I believe he -- we moved him to the right

9    of the door, and then he was secured -- or handed off to Sergeant

10   Matz.

11   Q    Also a TRT member, John Matz?

12   A    Yes, sir.

13   Q    Was there any plan prior to the knock-and-order-out to do a

14   protective sweep, from your understanding?

15   A    Prior to the knock-and-order -- no, there was not a plan in

16   place.

17   Q    Did you hear other TRT members talking about that, however,

18   as the people came out?

19   A    Yeah, as Mr. Henderson was moved over to the right side of

20   the door, I did hear someone to the left.  Something, kind of,

21   like, piqued my interest.  I heard "protective sweep."  I heard

22   those words.  So at that point is when I knew that there was

23   going to be a potential protective sweep.

24   Q    As a detective, did you ask questions just to, I guess,

25   maybe get consent to go into that apartment?
```

```
1    A    I did.  I thought I would just talk to Mr. Henderson, ask
2    him basic questions and attempt to get consent to, you know, get
3    consensual entry into the apartment.
4    Q    When he came out, was he being cooperative?
5    A    Yes.
6    Q    Was he immediately put in flex cuffs?
7    A    I don't recall how quick it was, but he was put into flex
8    cuffs.
9    Q    And did you ask him questions?
10   A    I did.
11   Q    What were those questions and his responses?
12   A    I asked him his name.  He answered for me.  I asked him if
13   it was his apartment.  He indicated it was.  Basic questioning I
14   do -- pretty much anybody coming out -- is I ask them if there's
15   anybody else in there for officer safety reasons.  He indicated
16   that nobody else was in there.  And then I asked him if we could
17   have consent to go in just to look for people, and he -- he gave
18   us -- he answered that we could.
19   Q    And did you say that -- how many times did you say that?
20   A    Which part?
21   Q    The part about "can we go in to look for people?"
22   A    I know I said it at least once, but I believe that I also
23   reiterated that we were just looking for people.
24   Q    And you said that he answered in the affirmative that you
25   could go in?
```

1    A    Yes.

2    Q    Was that verbal or a physical gesture?

3    A    I believe he was nodding his head, but I also do recall him

4    giving us a verbal consent.  I don't remember if he said "yes" or

5    "yeah," but it was definitely a verbal consent.

6    Q    So you remember both a physical response in the affirmative

7    and a verbal response in the affirmative?

8    A    I do, yes.

9    Q    And after Mr. Henderson said that to you, did you take that

10   as consent to go into the apartment to look for people?

11   A    Yes.

12   Q    And is that what a protective sweep is -- just looking for

13   people?

14   A    It is.  We're just looking for additional people, anybody

15   that could be a threat to officers or -- and maintain at the

16   apartment.

17   Q    Because you knew a search warrant was going to be written;

18   right?

19   A    Yes.

20   Q    After Mr. Henderson gave consent, what did you do?

21   A    After he gave consent, I verbalized that we had consent, and

22   I know the team made entry into that apartment.

23   Q    Did they conduct a protective sweep?

24   A    A protective sweep was conducted, yes.

25   Q    At some point after -- did you go to the apartment?

1    A    I did.  I briefly went in.  I remember that.

2    Q    After you -- your portion of the protective sweep was done,

3    did you assist Mr. Henderson in getting some clothes?

4    A    Well, I assisted with removing flex cuffs from his wrists so

5    he could get clothing on.

6    Q    Who was with him at the time?

7    A    Hmm.  That I don't remember who was with him at that exact

8    time.

9    Q    But did somebody bring out clothes for him?

10   A    Yes, clothing were brought out.  There was a number of us

11   standing around.

12   Q    And did Mr. Henderson specify what clothes he wanted and

13   where they could be found?

14   A    I believe he did.  I believe -- I'm -- I remember from

15   watching the body-cam footage, there was talk about clothing, but

16   I guess I don't remember exactly at that moment.

17   Q    And you said that you removed the flex cuffs?

18   A    I did.  With -- with scissors.

19   Q    Is that contained on the body cam?

20   A    It is.

21   Q    Were you aware, from the briefing, what the rationale was

22   for the protective -- or I'm sorry -- for the

23   knock-and-order-out?  Were there any concerns that law

24   enforcement had -- TRT?

25   A    Well, we thought there could possibly be armed individuals

1    on the inside, and it's always safer to have them come out to us

2    versus going in to them.

3    Q    And did you believe that eventually law enforcement would be

4    going in there and executing the search warrant?

5    A    Yes.  Yeah, absolutely.

6    Q    Do you recall about what time the entry was made?

7    A    It was just before 3:00 p.m.

8         MR. STEPHAN:  Thank you.  I don't have any further

9    questions.

10        THE COURT:  Cross-exam.

11        MR. VLSIDES:  Thank you, Your Honor.

12              C R O S S - E X A M I N A T I O N

13   BY MR. VLSIDES:

14   Q    Good morning, Detective.

15   A    Morning.

16   Q    Start with some basics.  You said you were not wearing a

17   body camera?

18   A    Correct.

19   Q    But you did review body camera for this hearing?

20   A    From Fitchburg officers, correct.

21   Q    Which officers?

22   A    I believe it was Officer Parker, the K9 officer, and then

23   the other officer is Juan -- I forget his last name.

24   Q    "Hinojos"?  Is that --

25   A    I do, yes.  I'm sorry.

1    Q    Excuse me.  I believe his last name is "Hinojos."  Is that

2    correct?

3    A    Oh, I thought you said "you know."  Yeah, I believe that's

4    it, yes.

5    Q    Okay.  No problem.  You did write a report relating to this

6    incident?

7    A    Yes.

8    Q    A one-page report?

9    A    Yes.

10    Q    You mentioned on direct that you were told this was related

11    to a -- a suspect in a shooting?

12    A    Correct.

13    Q    Who?

14    A    Who was the suspect?

15    Q    Yes.

16    A    That I don't -- I don't recall that.  I was told that there

17    was individuals related to a shooting inside that apartment.

18    Q    Okay.  So there were individuals related to a shooting?

19    A    Correct.

20    Q    When you arrived, you parked in the rear of the building?

21    A    It was a -- it was an address off of, if I remember

22    correctly, Traceway.  So, yeah, it was somewhere to the rear.

23    Q    Okay.  So that's actually a separate road?

24    A    Yeah, Post and Traceway kind of link up to each other.

25    Q    Not -- I guess not right out front of the building?

```
 1       A     Yeah, not right out front.
 2       Q     And the reason for that is to be a little bit more less
 3   noticeable?
 4       A     Correct.
 5       Q     So inside the building, you and the other officers gather --
 6   are gathered outside Apartment 207?
 7       A     Yes.
 8       Q     You attempted the "knock-and-order-out," I think is what
 9   you've been referring to it as?
10       A     Correct.
11       Q     You didn't have the warrant at that point, but you're hoping
12   they come to the door?
13       A     Correct.
14       Q     Your report states that while knocking on the door, it was
15   opened by an individual later known as "Calvin Henderson"?
16       A     Correct.
17       Q     There were also orders shouted into the apartment?
18       A     Orders is --
19       Q     Police shouted into the apartment?
20       A     After the door was opened?
21       Q     Excuse me.  Prior to the door being opened.
22       A     Yes.
23       Q     Yes.
24       A     They're at the door, knocking, making announcements,
25   correct.
```

```
1    Q    And one of those officers was Officer Parker?

2    A    Giving announcements, correct.

3    Q    And Officer Parker shouted something to the effect of "come

4    out now, or I will send my dog in, and you will be bit"?

5    A    Something of those words, yes.

6    Q    So that's an order to come out?

7    A    Essentially.

8    Q    If he doesn't come out, the police are coming in?

9    A    We would not have gone in without -- at that point, without

10   a warrant being signed.

11   Q    Okay.  So if he does- -- if -- because you didn't have a

12   warrant, you did not feel you could go into the apartment?

13   A    We -- yeah, correct.

14   Q    Okay.  But Officer Parker shouted into the apartment, and he

15   said "come out now" -- option 1 -- or "I will send my dog in";

16   correct?

17   A    Something to that effect, yes.

18   Q    And that dog is a K9 officer?

19   A    It's a K9 dog, yes.

20   Q    Okay.  The order to come out is not something that

21   Mr. Henderson could say "no" to?

22        MR. STEPHAN:  Objection.  Conclusion.

23        MR. VLSIDES:  I can move on.

24        THE COURT:  Please do.

25   BY MR. VLSIDES:
```

1    Q    When Mr. Henderson comes out of the apartment, he's

2    handcuffed?

3    A    Yes.

4    Q    That's not something he's allowed to say "no" to?

5    A    We would handcuff him for our safety and protection, yes.

6    Q    He's patted down?

7    A    I did not pat him down.  I don't think he was actually

8    patted down, because he was wearing underwear at that point.

9    Q    Fair point.  Fair point.

10         And you've run through the questions that you asked him

11   on direct, and one of those is you ask him if the police can go

12   in?

13   A    Correct.

14   Q    Did you present him with a written consent-to-search form?

15   A    No.

16   Q    So after the, let's say, "incident," you write your report?

17   A    Yes.

18   Q    You documented the request for consent?

19   A    Yes.

20   Q    And his answer in the affirmative?

21   A    Yes.

22   Q    You did not document any other basis to go into the

23   apartment?

24   A    Such as --?

25   Q    Anything else that -- that you could think of.

1    A     No, I did not.

2          MR. VLSIDES:  Those are my questions, Your Honor.

3          THE COURT:  Very well.  Any redirect?

4          MR. STEPHAN:  Briefly.

5                R E D I R E C T   E X A M I N A T I O N

6    BY MR. STEPHAN:

7    Q     At the time you wrote this report, was your report dated

8    January 27th of 2023?

9    A     Yes.

10   Q     At the time you wrote your report, did you know exactly what

11   issues may be raised in this case?

12   A     I'm -- no.  I don't think I knew the exact issues that would

13   be raised.

14   Q     But as a detective, you testified that you were specifically

15   kind of focused on the consent?

16   A     Correct.  That is, I felt getting consent would be -- I'm

17   going to use my words -- but cleaner for entry into the

18   apartment.

19   Q     And so you thought that was important in this case?

20   A     Yes.

21   Q     And is that one of the reasons why you documented that in

22   your report?

23   A     Yes.

24         MR. STEPHAN:  Thank you.  No further questions.

25         THE COURT:  All right.  Thank you, Detective.

```
 1              MR. VLSIDES:  Oh, I do have a follow-up.
 2              THE COURT:  I'll give you three.
 3              MR. VLSIDES:  Well, now I have to think more.
 4              THE COURT:  Please do.
 5                    R E C R O S S   E X A M I N A T I O N
 6   BY MR. VLSIDES:
 7        Q    When you say "consent," you mean "voluntary consent"?
 8        A    Yes.
 9        Q    And the surrounding circumstances are important to determine
10        voluntariness?
11              MR. STEPHAN:  Objection.
12              THE COURT:  Sustained.
13              MR. VLSIDES:  No more questions.
14              THE COURT:  That's only two.
15              Now you're done.
16              THE WITNESS:  Thank you.
17              THE COURT:  You're free to go about your business.
18              THE WITNESS:  Thank you.
19                        (Witness excused at 10:11 AM.)
20              MR. STEPHAN:  One more, Your Honor.
21              THE COURT:  Please call -- do we need a break?
22              MS. BLAIR:  Yes.
23              THE COURT:  All right.  Let's take a five-minute break.
24              MS. BLAIR:  Thank you, Your Honor.
25              THE COURT:  Do counsel need a break, or are you guys good?
```

```
 1              MR. STEPHAN:  I'm going to run outside for --
 2              THE COURT:  Yeah, that's fine.
 3              MR. STEPHAN:  -- two minutes if that's fine.
 4              THE COURT:  Detective, it's probably easier to go out that
 5      way.
 6              THE WITNESS:  Oh, sorry.
 7              (A break in proceedings from 10:11 AM to 10:13 AM.)
 8              THE COURT:  All right.  Let's continue on the record.
 9                  PLAINTIFF WITNESS, JONATHAN MATZ, SWORN
10              THE COURT:  There's water to your left if you need it.
11              THE WITNESS:  Thank you, sir.
12                      D I R E C T   E X A M I N A T I O N
13      BY MR. STEPHAN:
14      Q    Sir, could you please, for the record, state your full name,
15      spelling your last.
16      A    Jonathan Matz.  M-A-T-Z.
17      Q    And what's your profession, sir?
18      A    I'm a Sergeant with the Dane County Sheriff's Office.
19      Q    How long have you been a law enforcement officer?
20      A    I'm in my eleventh year right now.
21      Q    And what assignments do you have?
22      A    Currently assigned as a patrol sergeant out of the southeast
23      precinct, and I'm also an operator on the tactical response team.
24      Q    How long have you been on the TRT?
25      A    Four years.
```

1    Q    If I could direct your attention to January 26th of 2023, in

2    the early afternoon hours.  Were you on duty at that time?

3    A    I was not.  I was on a day off.

4    Q    Did you respond, however, to a TRT call-in?

5    A    Yes.

6    Q    And did you go to 2401 Post Road in the City of Fitchburg?

7    A    Yes.

8    Q    Upon arriving at that location, were you given a briefing as

9    to what the TRT's responsibilities and -- what was expected of

10    TRT at that location?

11    A    Yes.

12    Q    And what did -- what kind of information did you generally

13    get?

14    A    We had an understanding that Fitchburg Police and Madison PD

15    GNCAT was holding on an apartment that was associated to an

16    ongoing investigation.  They believed the apartment to be

17    occupied and that there were firearms inside.

18    Q    And did outside law enforcement officers see any indications

19    that there were people inside of the apartment?

20    A    Yes.  We had heard that they had seen blinds move to the

21    rear of the residence previous to our arrival.

22    Q    And were you aware that there was a school in the area?

23    A    Yes, there was -- I believe it's an elementary school that

24    would be just across the street to the north.

25    Q    After arriving at the scene, what did you do?

1    A    I arrived at the scene, put on all my protective equipment

2    and my assigned TRT equipment as normal.  I received a quick

3    stand-up briefing from Lieutenant Simpson and some others who had

4    gathered some preliminary information, and then myself and some

5    other operators who had also assembled moved up to a location

6    where law enforcement was basically staging.

7    Q    Down the hall from 207?

8    A    Correct.  Yeah, so we entered a staircase -- an exterior

9    staircase on the left side of the apartment complex, if you're

10   facing it from our direction -- and then there's an internal

11   stairwell, and then there's, like, a -- like, a landing with a

12   fire door with -- where you could have a visual on Apartment 207,

13   and that's where law enforcement had previously been staged.

14   Q    And what agencies were staged outside there, observing?

15   A    I had seen Madison Police and Fitchburg Police.

16   Q    And did TRT relieve them?

17   A    Yeah, we began gathering some preliminary information for

18   Madison Police, and we started the process of relieving them, and

19   then Fitchburg Police stood by with us.

20   Q    And what were you told Fitchburg was going to be doing to

21   further the investigation that day?

22   A    I was told that they were in the process of drafting a

23   search warrant.

24   Q    Was it for Apartment 207?

25   A    Yes.

1    Q     And was Fitchburg Police Officer Jonathan Parker and his K9

2    Drago there as well?

3    A     Yes.

4    Q     As you were staging and observing the apartment, did anyone

5    show you pictures of potential occupants of the apartment?

6    A     Yes.  Officer Parker was -- during the time that we were

7    staging and holding on that landing, Officer Parker was next to

8    me for the duration of that time and had basically showed me a

9    cellphone and had identified -- like had shown me a picture and

10   said this was one of the individuals were looking for.

11   Q     And was one of the pictures that he showed of Calvin

12   Henderson, the defendant herein?

13   A     Yes.

14   Q     Were you near Detective George Mayerhofer, also a TRT

15   member?

16   A     Yes.

17   Q     And about how long was TRT staged outside the apartment

18   before the knock-and-order-out happened?

19   A     I would say about 30 to 40 minutes.

20   Q     And who made the knock-and-order-out decision?

21   A     That decision came from our command element, which be --

22   would be -- Lieutenant Simpson is our team commander -- and then

23   whoever -- whoever he co-located with from other police agencies.

24   Q     And what did you do when that decision was made?

25   A     The decision was made.  We began moving towards the

1    apartment door and then took a position to begin knocking and

2    announcing our presence.

3    Q    And did anyone respond to the initial knocking?

4    A    I don't believe so.  I don't believe anybody, like, came to

5    the door -- nobody came to the door or anything right away.

6    Q    Did Officer Parker use his K9 and issue some commands to get

7    a response?

8    A    He did.

9    Q    And did that elicit some verbal reaction from the people

10   inside the apartment?

11   A    Yes.  Somebody yelled from inside the apartment.  I couldn't

12   say what they yelled, but something was yelled from inside the

13   apartment.

14   Q    And did people then start coming out of the apartment?

15   A    Yes.

16   Q    Who was the first one out?

17   A    Calvin Henderson.

18   Q    And what -- what did you do when Mr. Henderson came out?

19   A    I took control of Mr. Henderson and immediately removed him

20   from the doorway and moved him what would be to the right of the

21   doorway itself.

22   Q    And was Mr. Henderson being detained per the investigation?

23   A    Yes.

24   Q    Did you do anything to secure his hands?

25   A    Yes, I placed him in flex cuffs.

1    Q    And what are those?

2    A    They're a commercially available tool used commonly in

3    tactical operations.  Similar to handcuffs.  They're just, like,

4    zip ties that are manufactured together, but they operate in the

5    same way as zip ties.

6    Q    And are they readily available during your operations and

7    quick to put on?

8    A    Yes.  Yeah, we -- we, as a standard operating procedure,

9    carry them.  I carry several on all operations.  And, yes, they

10   take a very short amount of time.  They're -- they're basically

11   staged and prepared.

12   Q    And was -- after you put -- strike that.

13        Did you observe Detective Mayerhofer have any

14   conversations with Mr. Henderson when he came out of the

15   apartment?

16   A    Yes.  I secured Mr. Henderson and moved him to the right

17   side of the doorway.  Detective Mayerhofer came over to where we

18   were and asked -- asked him if -- if the apartment was his or

19   belonged to him and then asked if he could have consent to go in

20   and search for people.

21   Q    And do you recall what Mr. Henderson's responses were to

22   those questions?

23   A    Mr. Henderson nodded and answered in the affirmative.  I

24   can't say specifically what words he said.

25   Q    And specific as to the question of Detective Mayerhofer that

1    he was asking for consent to go in and look for people, do you

2    remember Detective Mayerhofer using words to that effect?

3    A    Yes, he -- I specifically remember him saying "for

4    people" -- that -- that phrase.

5    Q    And do you specifically remember Mr. Henderson's response to

6    that particular question?

7    A    Yes, he nodded and answered some -- something in the

8    affirmative.

9    Q    Did Mr. Henderson appear to be understanding and

10    appropriately responsive to Detective Mayerhofer's questions?

11    A    Yes.

12    Q    Did he appear to be confused at all?

13    A    No.  He seemed surprised, but not confused.

14    Q    Did he appear injured in any way?

15    A    No.

16    Q    Was anyone applying physical force to him when Detective

17    Mayerhofer asked him those questions?

18    A    No.

19    Q    After Detective Mayerhofer got the consent, did you enter to

20    assist in the clearing the apartment?

21    A    Yes.

22    Q    And by "clearing," I mean "protective sweep."  Is that --

23    A    Correct.

24    Q    When people were coming out of the apartment, was the K9

25    still in the immediate area of the people in the doorway?

1    A    I don't believe so.  I believe Officer Parker moved the K9

2    out of the immediate hallway area.

3    Q    During the protective sweep and -- was -- was Mr. Henderson

4    still outside the apartment?

5    A    Yes.

6    Q    And did you do a pat-down of Mr. Henderson?

7    A    No, I don't recall doing a pat-down.  He was -- at the time,

8    when I had initial contact with him, he was only wearing boxers.

9    I didn't feel like it was necessary.

10   Q    Okay.  And did you hear a discussion that other law

11   enforcement officers had with Mr. Henderson about finding clothes

12   for him to wear?

13   A    Yes.

14   Q    And what do you recall about that?

15   A    I remember being in the apartment, assisting with the

16   protective sweep, and individuals asking for assistance and

17   locating clothing for Mr. Henderson.

18   Q    And was Mr. Henderson telling officers where to find

19   specific clothing?

20   A    Yeah, I believe so.  I remember hearing something about the

21   back bedroom or something to that effect about where clothing was

22   located.

23   Q    Did the officers bring clothes out for him?

24   A    Yes.

25   Q    When the clothes were brought out to Mr. Henderson, did

1    someone remove the flex cuffs?

2    A     Someone did, yes.

3          MR. STEPHAN:  I don't have any further questions.  Thank

4    you, Your Honor.

5          THE COURT:  Cross-exam.

6          MS. BLAIR:  Yes.  Thank you, Your Honor.

7                    C R O S S - E X A M I N A T I O N

8    BY MS. BLAIR:

9    Q     Good morning.

10   A     Good morning.

11   Q     You testified that you work as part of the tactical response

12   team?

13   A     Yes, ma'am.

14   Q     How often are you called upon to be part of that team?

15   A     Our calls -- we're subject to emergency calls and planned

16   operations.  So I would estimate anywhere between 50 to 75 calls

17   a year.

18   Q     Okay.  So maybe in six months, 25 to right under 40 or so?

19   A     Sure.  Yes.

20   Q     As an estimate?

21   A     Mm-hmm.

22   Q     Okay.  The incident that we're talking about with apartment

23   207 happened back in January of 2023; right?

24   A     Mm-hmm.

25   Q     And you wrote a report in this case that's listed as

```
 1        Exhibit 4.  But you wrote a report in this case?
 2    A     Yes.
 3    Q     And you didn't write the report in January of 2023?
 4    A     I did not.
 5    Q     You wrote the report on July 3rd of 2023?
 6    A     Yes, ma'am.
 7    Q     Okay.  Now, you wrote the report after you spoke to the
 8        government in this case?
 9    A     Yes.
10    Q     Okay.  And based on that conversation, you understood that
11        there was a motion where Mr. Henderson was saying, "Listen:  I
12        didn't consent"?
13    A     That was my understanding.
14    Q     And then you wrote the report?
15    A     Yes, ma'am.
16    Q     Okay.  And in the report, you documented -- you said,
17        "Listen:  I remembered that he did consent"?
18    A     Yes.
19    Q     You remembered that he nodded?
20    A     Yes.
21    Q     Okay.  Now, did you review other body-worn camera -- I
22        believe you said you did -- before testifying here today?
23    A     Yes.
24    Q     Okay.  And you're aware that none of the body-worn camera
25        captured this alleged consent that Mr. Henderson gave?
```

1    A    I'm aware of that.

2    Q    Okay.  I want to talk about the initial entry itself.  In

3    your report that we previously talked about, you wrote that a

4    police K9 began barking, which prompted the occupants of 207 to

5    open the door and begin to exit?

6    A    Yes.

7    Q    Okay.  I'm going to play a clip.  This is from Officer

8    Hinojos's body-worn camera, which is also Exhibit 6.  Exhibit 6.

9         MR. STEPHAN:  I may have screwed up your numbering --

10            (Video played from 10:26 AM to 10:28 AM.)

11   BY MS. BLAIR:

12   Q    You reviewed the body cam before today?

13   A    Yes, ma'am.

14   Q    I'm going to play one more clip later on, but I'd like to

15   focus on this one for a moment.  While TRT and the other officers

16   are outside the apartment, the K9 does begin barking --

17   A    Mm-hmm.

18   Q    -- before Officer Parker approaches the door?

19   A    Yeah, I did hear that.

20   Q    He barks a couple of times?

21   A    Mm-hmm.

22   Q    And that doesn't really prompt or make anyone come to the

23   door, it seems?

24   A    Mm-hmm.

25   Q    Okay.  Is that a "yes"?

```
 1        A     Yes.  Sorry.

 2        Q     That's okay.

 3        A     I apologize.

 4        Q     Okay.  And it's not until Officer Parker goes to the door

 5        and says, "Come out, or my dog will go in, and you will be bit,"

 6        that they come out?

 7        A     Yes.

 8        Q     And those words -- anything about a dog bite or a threat --

 9        those are nowhere in your report?

10        A     Yeah, I didn't -- at the time, when I wrote the report,

11        didn't recall the specific statements that Officer Parker was

12        making.  I didn't review the body cam before I wrote the report.

13        I was just going based off my recollection from January.

14        Q     Okay.  You didn't recall the statements from Officer Parker?

15        A     Correct.

16        Q     All right.

17              MS. BLAIR:  I'm going to play one more short clip.

18                   (Video played from 10:30 AM to 10:34 AM.)

19  BY MS. BLAIR:

20        Q     Okay.  Based on your report, you believe that the consent

21        was obtained right after Mr. Henderson comes out of the

22        apartment?

23        A     Yes.

24        Q     Okay.  So immediately after he's brought to the side and

25        cuffed?
```

1    A    Shortly thereafter.

2    Q    Okay.  How many TRT officers are in the hallway at that

3    point, approximately?

4    A    Approximately eight -- six to eight, maybe.

5    Q    And each officer should be armed with two guns -- one rifle

6    and one handgun?

7    A    Typically.

8    Q    There's even someone with a shield?

9    A    Yes.

10   Q    Okay.  And while you're there, you also have a rifle?

11   A    Yes.

12   Q    Okay.  You're wearing a helmet.  You referred to it also as

13   wearing armor?

14   A    Yes.

15   Q    Okay.  Now, when Mr. Henderson initially comes out, like we

16   see, he's in his underwear?

17   A    Yes, ma'am.

18   Q    The group of officers is still around?

19   A    Yes.

20   Q    And he's facing the wall?

21   A    Yes.

22   Q    At no point does anyone present him with a signed -- a form

23   that he could sign to say, "Sure, you can go into my apartment"?

24   A    Not to my knowledge.

25   Q    And I believe we hear one other TRT member say, "Hey, no one

1    else is in there"; right?  And he says, "No"?

2    A    I believe so.

3    Q    Now, before you wrote your report in July, did you review

4    Officer Mayerhofer's report?

5    A    Yes.

6    Q    Okay.

7         MS. BLAIR:  I have no other questions.  Thank you very much.

8         THE WITNESS:  Yes, ma'am.

9         THE COURT:  Very well.  Did you wish to redirect?

10        MR. STEPHAN:  Just briefly.  A couple.

11             R E D I R E C T   E X A M I N A T I O N

12   BY MR. STEPHAN:

13   Q    Did -- sometime in early July, did you become aware of this

14   motion to suppress?

15   A    Yes.

16   Q    And did you realize that you observed something that may be

17   important?

18   A    Yes.

19   Q    And what was that?

20   A    That was the consent that Mr. Henderson gave to Detective

21   Mayerhofer.

22   Q    And is that what -- why you wrote your report?

23   A    Yes.

24   Q    And your report has two dates on it.  On the top is July 6th

25   of '23, and underneath that is July 3rd of 2023.  Which of those

1     was the report date that you actually wrote it?

2     A     I think I submitted the report on the 6th.

3     Q     Would you have -- okay.

4     A     No.  I take that back.  I wrote the report on the 3rd, and I

5     believe I, like, pulled the report off the system on the 6th.

6     Q     Okay.  Thank you.

7                 And Mr. Henderson's consent that you testified to --

8     did that happen prior to officers making the entry for the

9     protective sweep?

10    A     Yes.

11          MR. STEPHAN:  Thank you.  No further questions.

12          THE COURT:  Did you want three more on recross?

13          MS. BLAIR:  I don't, Your Honor.

14          THE COURT:  All right.  Thank you, Sergeant.  You're done.

15    You may resume your business.

16          THE WITNESS:  Thank you, sir.

17                    (Witness excused at 10:37 AM.)

18          THE COURT:  Mr. Stephan, that's three.  Did you have other

19    witnesses or other exhibits beyond those that we've already

20    discussed that you wish to put into the evidentiary record?

21          MR. STEPHAN:  No, thank you, Your Honor.

22          THE COURT:  So you're resting for the purpose of making your

23    evidentiary record in opposition to the motion?

24          MR. STEPHAN:  Correct.

25          THE COURT:  Very well.

1    Ms. Blair, do you have any additional witnesses you'd like

2    to present today?

3    MS. BLAIR:  No, Your Honor.

4    THE COURT:  Do you have any exhibits beyond those that we've

5    already discussed that you'd like to offer?

6    MS. BLAIR:  No, Your Honor.

7    THE COURT:  So you're resting for the purpose of making your

8    evidentiary record?

9    MS. BLAIR:  One moment.  I apologize.

10    (A discussion is held off the record.)

11    MS. BLAIR:  Yes, I am resting.

12    THE COURT:  Okay.  So the evidentiary record is closed.

13    Let me suggest this.  We need to finish the calendar, but

14    that's usually done off the record, telephonically.  We happen to

15    be gathered.  What I'd like to do is excuse Mr. Henderson, excuse

16    our court reporter, and then just continue off the record to set

17    the schedule, which I then will commemorate in a text-only order.

18    Ms. Blair, are you comfortable with that?

19    MS. BLAIR:  May I just --

20    THE COURT:  Yes.

21    (A discussion is held off the record.)

22    MS. BLAIR:  Yes, that's fine, Your Honor.

23    THE COURT:  Very well.

24    Mr. Stephan, are you comfortable with that?

25    MR. STEPHAN:  Yes.  Thank you.

```
1              THE COURT:  Then that's what we'll do.  We'll continue off
2         the record.  I will excuse Mr. Henderson.  I will excuse our
3         court reporter.  And we will set the schedule.
4                        (Proceedings concluded at 10:38 AM.)
5                                    ***
6    I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and
7    for the State of Wisconsin, certify that the foregoing is a true and
8    accurate record, transcribed to the best of my ability, of the
9    proceedings held on the 12th day of July 2023, before the Honorable
10   Stephen L. Crocker, Magistrate Judge for the Western District of
11   Wisconsin, and reduced to writing in accordance with my stenographic
12   notes made at said time and place.
13
14
15
16                        Dated this 24th day of July, 2023.
17
18
19
20                             /s/ Philip C. Harrelson
21                        Philip C. Harrelson, RMR, CRR
22                        Federal Court Reporter
23
24
25   The foregoing certification of this transcript does not apply to any
     reproduction of the same by any means unless under the direct coal
     and/or direction of the certifying reporter.
```