IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

v.

CALVIN M. HENDERSON, SR.,                    Case No:  23-cr-48-wmc

Defendant.

GOVERNMENT'S BRIEF IN OPPOSITION OF DEFENDANT'S MOTION TO SUPPRESS

## **INTRODUCTION**

On January 26, 2023, Detective Jordan Trundle of the Fitchburg Police Department, applied for and received a search warrant for 2401 Post Road, Apartment 207 ("Apt. 207") from a Dane County circuit court judge. Near the end of his nine-page supporting affidavit, Detective Trundle briefly described evidence officers observed while conducting a consensual protective sweep of Apt. 207. As a result of the search warrant, law enforcement found three firearms leading to the present indictment. (Dkt. 1).

The defense filed a motion contending that the protective sweep of Apt. 207 was an unlawful search done without Henderson's consent. (Dkt. 18). They argue that Detective Trundle's inclusion of the protective sweep information in his warrant affidavit invalidates the warrant, that Henderson did not consent to the protective

sweep (or in the alternative that consent was not voluntary), and move to suppress the evidence obtained pursuant to it.

The defense's motion to dismiss must be denied for three reasons. First, if the observations from the protective sweep are removed from the affidavit, the remaining information still supports probable cause to issue the search warrant. Second, the defendant consented to the protective sweep and it was not an unlawful search, and alternately it was justified by exigent circumstances. And third, even if this Court were to find that the warrant affidavit did not establish probable cause to issue a search warrant, the Fitchburg police department relied on the warrant in good faith and therefore, suppression is not justified.

## FACTUAL BACKGROUND

### *Initial Investigation*

This investigation began in December 2022 when Sam Crump, an occupant of Apt. 207, was identified as a potential suspect in a recent shooting. (Dkt. 18-1, 5). Detective Trundle spoke to witnesses who described Crump's potential involvement in the December shooting, identified Sam as an occupant of 2401 Post Road, Apt. 207, said Sam's roommate was Calvin Henderson, and described drug activity they believe Crump and Henderson to be involved in. (*Id.*).

Detective Trundle then spoke to Detective Niebuhr, a Dane Country Narcotics Task Force officer, who corroborated the witness's information. (*Id.* at 6). Detective Niebuhr believed that Crump and Henderson were dealing illegal drugs out of the Apt 207 and had firearms in the apartment. (*Id.*) Shortly thereafter, several concerned

citizens contacted Fitchburg Police Department to report that they believed Crump and Henderson were selling illegal drugs out of Apt. 207. (*Id.*).

*Surveillance of Apt. 207and the Arrest and Subsequent Interview of Oscar Ballesteros*

After the initial investigation, Detective Trundle began surveilling Apt. 207 and observed an individual, later identified as Oscar Ballesteros, driving Crump's car. (*Id.* at 6-7). On January 25, 2023, Officer Hinojos pulled Ballesteros over for a traffic stop. (*Id.* at 7). During the stop Ballesteros told officers he had been staying with Crump for some time. (*Id.*). The next day, January 26, 2023, around 11:45 AM Officer Hinjos stopped Ballesteros as he was walking on Post Road. (*Id.*). Officer Hinojos searched Ballesteros and found heroin, which Ballesteros said he received from Crump. (*Id.*).

During a subsequent interview at Fitchburg Police Department, Ballesteros described, in detail, the make, model, and location of four firearms that he said were in Apt 207. (*Id.* at 7-8). He said that there would be four handguns in the apartment, specifying that two are Glocks, one a 9mm, and the other a .45. (*Id.*). Ballesteros also informed the officer that they would find powder cocaine and heroin in a lock box in Apt. 207, which Ballesteros admitted to helping deal. (*Id.*). Ballesteros told officers he had been buying drugs from Henderson for twenty years and that Crump admitted to shooting a firearm outside the apartment complex during a disturbance that took place in early December 2022. (*Id.*). Finally, Ballesteros indicated that both Crump and Henderson were in the apartment when Oscar left that morning. (*Id.*).

3

Based on this information, Detective Trundle began drafting a search warrant application at approximately 1:20 p.m. (T. 20:19-21:14).[1]

### *The Protective Sweep*

The Dane County Tactical response team was called to assist Fitchburg Police Department in conducting the expected search warrant at Apt. 207. (*Id.* at 37:25-38:5). This operation presented several safety concerns. First, before arriving, the tactical team members were informed that one of the suspects has been linked to a shooting, and that there were firearms and illegal drugs in the apartment. (*Id.* at 39:18-40:5); (*Id.* at 22:17-24). Second, 2401 Post Road is located across the street from an elementary school, where let out time was quickly approaching. (*Id.* at 39:18-40:5). Thirdly, residents were likely to begin returning from work soon. (*Id.*).

The tactical team staged in the hallway outside Apt. 207 and waited 40 minutes but the search warrant was not yet issued. (*Id.* at 56:17-19). During this time officers heard voices within the apartment and saw blinds moving. (*Id.* at 54:18-21). The tactical team believed their presence was known. (*Id.* at 20:1-21); (*Id.* at 12:24-13:8). As time went on, the concerns of school letting out and residents returning from work became pressing safety concerns. Therefore, at 2:57 p.m., the tactical team initiated a "knock and talk." (*Id.* at 41:10-14); (*Id.* at 21:13-16). The occupants of Apt. 207 did not respond. (*Id.* at 41:10-14). Officer Parker and his K9, Drago, then used a common de-escalation

---

[1] Citations to the transcript of the evidentiary hearing will be written as "T." followed by the page number and line numbers that the information can be located at.

technique known as a "bark-out." (*Id.* at 8:8-9:25). Drago began barking and Officer Parker notified the occupants of Apt. 207 of Drago's presence. (*Id.*). Crump and Henderson then exited the apartment. (*Id.* at 14:2-20). Officer Parker and Drago then removed themselves to a corner where Drago was calm and quiet. (*Id.*).

When Henderson stepped out of the apartment, Officer Matz, a tactical team member, took Henderson to the side. (*Id.* at 57:16-58:5). Matz placed Henderson in flex cuffs. (*Id.*). Detective Mayerhofer heard someone on the team mention "protective sweep" and, due to his experience as a detective, decided to talk with Henderson to ask for consent to enter the apartment. (Id. at 42:13-43:43:3). Mayerhofer approached Henderson (*Id.* at 42:3-44:8; 58:13-59:8) and asked if he was the leaseholder of Apt. 207. (*Id.* at 42:3-44:8). Henderson responded yes. (*Id.* at 42:3-44:8). Mayerhofer asked Henderson if officers could enter the apartment "to look for people." (*Id.* at 42:3-44:8); (*Id.* at 58:13-59:8). Mayerhofer and Matz both testified that Henderson responded verbally in the affirmative and nodded his head yes. (*Id.* at 42:3-44:8); (*Id.* at 58:13-59:8). Mayerhofer and Matz were not wearing body cameras as, at the time, the tactical team was not issued body-worn cameras (BWC). (*Id.* at 38:12-15). However, Deputy Mayerhofer was aware that Fitchburg officers were wearing BWC's. (T. 38:12-25). Mayerhofer and Matz both testified that Henderson seemed to be understanding, responsive, and cooperative when he gave consent. (*Id.* at 42:3-44:8); (*Id.* at 58:13-59:8).

After Henderson gave consent, the tactical team entered Apt. 207 and performed a protective sweep. (*Id.* at 44:20-24). While in the apartment officers observed, in plain view, a firearm magazine, rifle ammunition, and a razor blade and white powdery

5

substance. (R.18-1, 9). These observations were relayed to Detective Trundle, who was finishing drafting his search warrant affidavit. (T. 26:24-227:10). Detective Trundle included the information obtained during the protective sweep in a short paragraph at the end of his affidavit. (R. 18-1, 9). The application for a search warrant was submitted shortly thereafter.

The search warrant for Apt. 207 was issued and executed. As a result of their search. Fitchburg Police Department found drugs and firearms, which led to this indictment. The defense now moves to suppress the evidence obtained pursuant to the warrant, contending that the warrant was secured using "unlawfully obtained information." (Dkt. 29).

## <u>ARGUMENT</u>

The Fourth Amendment protects individuals against unreasonable search and seizure. U.S. Const. Amend. IV. For a search to be considered reasonable, officers are typically required to obtain a warrant. *Riley v. California*, 573 U.S. 373, 382 (quoting *Vernonia School Dist. 47J v. Acton*, 515 U. S. 646, 653 (1995). Search warrants are issued upon a finding of probable cause. *United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021). Probable cause for issuance of a search warrant exists when the warrant application establishes that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*  However, when a warrant affidavit includes unlawfully obtained information, suppression of the warrant and the evidence obtained pursuant to it is not always required. *United States v. Shelton*, 997 F.3d 749, 770 (7th Cir. 2021). When there is sufficient lawfully obtained information in the warrant

affidavit to support a finding of probable cause and justify issuing the warrant, then the warrant is valid, and suppression is unnecessary. *Id.*

Moreover, in certain circumstances, warrantless searches can be reasonable. *Riley,* 573 U.S. at 382. Such instances include when a person voluntarily consents to a search and when exigent circumstances exist. *Steagald v. United States*, 451 U.S. 204, 205-206 (1981). Lastly courts have long recognized that when officers, in good faith, rely on a search warrant, suppression is not justified absent a showing that the officer's reliance was unreasonable. *Woodfork*, 999 F.3d at 519.

The Court should deny Henderson's motion to suppress for three reasons. First, Detective Trundle's warrant affidavit would still support a finding of probable cause if the information from the protective sweep were struck. Therefore, the warrant, and the evidence obtained pursuant to it, are valid regardless of whether the protective sweep was unlawful. Second, the protective sweep was a lawful consent search which was also supported by exigent circumstances. And third, the Fitchburg Police Department relied on the warrant in good faith, and therefore suppression is unwarranted.

I.   **Detective Trundle's warrant affidavit would still support a finding of probable cause if the information from the protective sweep were excluded.**

The court need not decide if the protective sweep was a lawful search, because Detective Trundle's warrant affidavit would still support a finding of probable cause if the information from the protective sweep were excluded. Accordingly, the search warrant is valid, and suppression of the evidence is unnecessary.

Evidence obtained pursuant to a search warrant is not automatically suppressed if an officer includes unlawfully obtained information in a warrant affidavit. *Shelton*, 997 F.3d at 770. If the legally obtained information in the affidavit is sufficient to support probable cause and justify issuing the search warrant, the warrant and evidence obtained pursuant to it are nonetheless valid. *Id.* When assessing whether to suppress evidence pursuant to a warrant that was secured, at least in part, using unlawfully obtained information, courts assess whether the unlawfully obtained information affected the judge's issuance of the warrant and whether that information prompted the officer's decision to seek a warrant. *Id.*

Probable Cause for the issuance of a search warrant is determined by the totality of the circumstances; it is a practical, common-sense determination. *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). Probable cause does not mean an absolute certainty. *United States v. Watts*, 535 F.3d 650, 656 (7th Cir. 2008). Rather, probable cause is "established when the supporting affidavit sets forth circumstances sufficient for a reasonably prudent person to believe that a fair probability exists of finding contraband or evidence of a crime." *Id.*

Here the information from the protective sweep neither affected the Judge's decision to issue the search warrant nor prompted Detective Trundle to seek a search warrant. First, if the information from the protective sweep were excised from Detective Trundle's warrant affidavit, the remaining information would still support a finding of probable cause.

Detective Trundle started writing the search warrant at 1:20 p.m. after Ballesteros was stopped and gave a statement that Henderson and Crump were in the apartment along with guns and drugs. Ballesteros's criminal history and requests for lenience were also included so the reviewing judge could assess his credibility. An hour and a half had passed since Detective Trundle started drafting the warrant to when TRT decided to do the knock and talk.

Detective Trundle had already made the decision to write, seek, and execute a search warrant before TRT saw a firearm magazine, ammunition, and drug paraphernalia. In fact the sole reason that the TRT was there was to assist in executing the expected search warrant.

Presuming that the observations made by TRT (firearm magazines, ammunition, and drug paraphernalia) are struck from the affidavit, the remaining information is sufficient, on its own, for a reasonably prudent person to believe there is a fair probability of finding illegal contraband or evidence relating to a crime in Apt. 207. Therefore, the information from the protective sweep did not affect the judge's decision to issue the warrant.

Second, the information from the protective sweep did not prompt Detective Trundle to seek a search warrant. Rather, Detective Trundle was prompted by his earlier investigation, as well as the arrest and subsequent interview of Oscar Ballesteros, to seek a search warrant. In fact, Detective Trundle was almost done drafting his search warrant application when the protective sweep began.

The information obtained during the protective sweep did not affect the Judge's decision to issue the warrant, nor prompt Detective Trundle to seek the warrant. Thus, the warrant is considered valid, and evidence obtained pursuant to the warrant should not be suppressed.

**II.      The Protective Sweep of Apt. 207 was a lawful search.**

If the Court finds that Detective Trundle's affidavit does not support a finding of probable cause without the information from the protective sweep, then the government contends that the protective sweep of Apt. 207 was nevertheless a lawful search.

Exception to the Fourth Amendment's warrant requirement include consent and exigent circumstances. *Steagald*, 451 U.S. at 205-206. Thus, the protective sweep of Apt. 207 was lawful because Henderson voluntarily consented to the search. Alternatively, if the court finds that Henderson did not consent, then the protective sweep of Apt. 207 is nevertheless, still lawful under exigent circumstances.

a.   *Henderson voluntarily consented to the protective sweep of Apt. 207.*

Warrantless searches are lawful when a defendant voluntarily consents to a search. *United States v. Groves*, 470 F.3d 311, 318 (7th Cir. 2006). Courts consider several factors when determining the voluntariness of consent: " (1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion  was used; and (6) whether he was in custody when he consented." *United States v. Thurman*, 889 F.3d 356,

367 (7th Cir. 2018). When determining the voluntariness of consent the court carefully considers "all of the surrounding circumstance" and no one factor is dispositive. *Groves*, 470 F.3d at 321-322. The government must prove by a preponderance of the evidence that the defendant consented to the challenged search. *United States v. Hicks (Hicks II)*, 650 F.3d 1058, 1064 (7th Cir. 2011).

A person can be detained, or not free to leave, and still give voluntary consent. *Unites States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) ("custody is not dispositive so long as the potentially coercive effect of custody was mitigated by the circumstances"). Officers drawing their firearms does not obviate voluntariness. *United States v. LaGrone*, 43 F.3d 332, 333-334 (7th Cir. 1994) (the Court did not find "the atmosphere was so highly stressful and coercive that a reasonable person would involuntarily consent to a search").

Strache was contacted and placed in handcuffs by deputies after his girlfriend reported that he was armed and suicidal. *Strache*, at 982-983. One deputy "interrogated Strache briefly," but he denied being suicidal and said his girlfriend was lying. *Id*. Convinced of the girlfriend's story, deputies received consent from Strache's roommates to go into the residence and one warned that Strache kept a hand grenade and other weapons in his room. *Id*. Deputies asked Strache about those items and he explained that they were only "uncharged grenades." *Id*. Without reading Strache *Miranda* warnings, an officer asked if they could "take a look" inside of his bedroom. *Id*. Strache, who was "calm, relaxed and cooperative" consented. *Id*. Law enforcement

11

quickly discovered pipe bombs and evacuated the residence while summonsing specialist units. *Id*.

Strache complained that police coerced him into giving involuntary consent. *Id*. at 985. The Court concluded that Strache was cooperative and coherent. *Id*. As to the deputies getting him out of bed, placing him in custody, and failing to advise him of his rights, those factors were "not dispositive so long as the potentially coercive effect of custody was mitigated by other circumstances." *Id*. at 986. Though Strache was handcuffed, the "police did not badger him for information or consent, nor physically abuse or pressure him" and he was only in custody for twenty minutes. *Id*. The Court affirmed the district court's conclusion that the consent was voluntary. *Id*.

In Henderson's case, he came out of the apartment, appeared to understand what the deputies were asking him, and was responsive and cooperative. He was not advised of his constitutional rights. He was only detained moments before immediately giving consent. TRT was armed and there was a "bark out" used. He was being detained and was not free to leave.

Both Detective Mayerhofer and Deputy Matz testified that Henderson verbally responded in the affirmative and nodded his head yes when asked if TRT officers could enter the apartment to look for people. While TRT was not wearing body-worn cameras (BWC) due to pending department approval, Deputy Mayerhofer was aware that Fitchburg officers did wear BWC's. (T. 38:12-25). Therefore, it was reasonable for Detective Mayerhofer to believe that his actions would be recorded by Fitchburg BWC's.

The defense did not impeach these witnesses' credibility, offer any motive for them to lie, nor explain why they would try to fabricate consent when there were BWC's behind them.

Detective Mayerhofer and Deputy Matz testified truthfully and this court should find that Henderson gave them affirmative consent to enter his apartment to look for other persons who might be in there.

   b.  *The protective sweep of Apt. 207 was justified by exigent circumstances.*

If this Court finds that Henderson did not voluntarily consent to the protective sweep, then the protective sweep was still justified by exigent circumstances.

Warrantless searches are reasonable when exigent circumstances create a "compelling need for official action and insufficient time to secure a warrant." This allows officers to enter a residence without a warrant to address threats to law enforcement or the general public's safety. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 493 (7th Cir. 2021) (citing *Caniglia v. Strom*, 141 S. Ct. 1596, 1603 (2021) (Kavanaugh, J., concurring)).

When determining whether exigent circumstances exist, courts "analyze the situation from the perspective of the officers at the scene." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (quoting Leaf v. Shelnutt, 400 F.3d 1070, 1081 (7th Cir. 2005)).  Exigent circumstances exist when an officer objectively and reasonably believes "there [is] a compelling need to act and no time to obtain a warrant" Id. (quoting *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005)).

13

In *United States v Stowe*, the Seventh Circuit held that exigent circumstances existed when "information leads police to reasonably conclude that the defendant is armed, dangerous, and possesses large amounts of cocaine." 100 F.3d 494, 496 (7th Cir. 1996). In Stowe, officers entered the residence of a defendant without a warrant. Hours before officers were informed that the defendant was a convicted felon, that his apartment was protected by a steel door, and a large amount of illegal drugs and a firearm were inside the apartment. The court reasoned that because "drug dealing is a crime infused with violence," and because the officers had recently learned of the presence of drugs and guns inside the apartment, the officers' fear of a possible gun fight was reasonable, so exigent circumstances existed. Id. (citing *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995).

In Henderson's case, this was an investigation where the risk was high enough that Fitchburg called in TRT to assist in serving a warrant that they anticipated getting signed by a Dane County judge.  They had credible information that there were several guns and controlled substances in Apt. 207.

Officers had just done a consent search of the apartment directly below Apt. 207, and there was information leading officers to believe that word had made it back to the suspects in 207. There were voices heard from inside of Apt. 207 and officers saw the blinds moving. It was reasonably obvious that the occupants of Apt. 207 were aware of the high level of law enforcement activity in the area, and that the apartment was soon to be the next focus of police attention.

14

The apartment was right across the road from a school, which was about the let out for the day.  And there were concerns that if the search warrant took much longer there would be post-work traffic. Detective Trundle deferred the on scene tactical decisions to TRT, who ultimately made the determination to do the "knock and talk" and then "bark out."

Under these very specific and exigent circumstances, it was justified for law enforcement to order the subjects out of Apt. 207 and to freeze the scene prior to execution of the search warrant. This was due to concern for the safety of the officers and community, and the potential for destruction of evidence.

**III.      The Fitchburg Police Department relied on the warrant in good faith.**

If this Court finds that the warrant affidavit did not establish probable cause and the search warrant was invalid, the evidence obtained pursuant to the warrant should nevertheless still be admitted, because officers relied on the warrant in good faith.

Evidence obtained pursuant to an invalid search warrant may still be admitted if the officers relied on the warrant in good faith. *United States v. Woodfork*, 999 F.3d 511, 519 (7th Cir. 2021). Notably, "an officer's decision to obtain a warrant creates a presumption" of good faith. Id. (quoting *United States v. Grisanti*, 943 F.3d 1044, 1049 (7th Cir. 2019)). To rebut the presumption of good faith a defendant must show that the judge issuing the warrant "abandoned their neutral role", that the officer preparing the warrant affidavit was dishonest, or the warrant was "so lacking in probable cause that the officer belief in existence was entirely unreasonable" Id. (citing *United States v. Mitten*, 592 F.3d 767, 771 (7th Cir. 2010)).

Here Detective Trundle was actively drafting the search warrant when the bark out, consent, and protective sweep happened.  He presented the search warrant to a Dane County Circuit Court judge who reviewed, approved, and signed it. There is a presumption that he acted in good faith. The affidavit contains sufficient information that a reasonable officer had a good faith basis for relying on the judicially reviewed and signed warrant.

**IV.      Conclusion.**

Prior to the disputed entry, Detective Trundle had already made the decision to seek a search warrant and had started writing it. When TRT decided that safety concerns dictated that they needed to contact the apartment, Henderson voluntarily consented to officers' entry into the apartment to look for other people that might be in there. The exigent circumstances would have justified a protective sweep to freeze the scene while they waited for the search.

But regardless of the legality of the entry, if the minimal amount of evidence observed by TRT were struck from the affidavit, the facts therein would still support probable cause for issuance of the search warrant.

Therefore, Henderson's motion should be denied.

Dated August 25, 2023               Respectfully submitted,


                                    TIMOTHY M. O'SHEA
                                    United States Attorney

                                    By: /s/
                                    COREY C. STEPHAN
                                    Assistant United States Attorney